UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL JONES,

      Plaintiff,                      Civil Action No. 12-14119

v.                                HON.  GEORGE CARAM STEEH
                                   U.S. District Judge
                                   HON. R.  STEVEN WHALEN

COMMISSIONER OF SOCIAL      U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Daniel Jones brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying his application for Supplemental Security Income ("SSI") under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

On October 14, 2009, Plaintiff filed an application for SSI alleging disability as of July 31, 2009.  (Tr. 111-13).  Plaintiff amended his alleged onset date to the date of filing, October 14, 2009. (Tr. 26-27, 191).  After the initial denial of his claim, Plaintiff

requested an administrative hearing, held March 16, 2011 before Administrative Law Judge ("ALJ") David K. Gatto (Tr. 23).  Plaintiff, represented by attorney Clifford Walkon, testified in person, as did vocational expert ("VE") Glee Ann Kehr (Tr. 25). On May 6, 2011, ALJ David K. Gatto determined that Plaintiff was not disabled (Tr. 62). On July 26, 2012, the Appeals Council denied review (Tr. 1-3).  Plaintiff filed for judicial review of the administrative decision on September 17, 2011.

## BACKGROUND FACTS

Plaintiff, born June 8, 1958, was 51 when the ALJ issued his decision (Tr. 111). He completed eleventh grade and worked previously as a truck driver, truck loader, hi-lo driver, and a bar man for a plating company (Tr. 137).  He alleges disability as a result of cracked ribs and bad knees (Tr. 136).

### A.     Plaintiff's Testimony

*Plaintiff's counsel prefaced his client's testimony by explaining that the onset date was amended to the date of filing, October 14, 2009 (Tr. 26-27).*

Plaintiff testified that he had not worked anywhere since October 2009 and he lived with his brother (Tr. 28).  He stated that he began taking classes in paralegal studies at Wayne Community College in August of 2009, with an expected graduation date of summer of 2012 (Tr. 28-29).  He testified he hoped to obtain a part-time job after graduation (Tr. 29).  He reported that at the time of the hearing he was enrolled in three classes which were each three hours long (Tr. 28).  He explained that he was in class for a total of two days per week (Tr. 28).  He later explained that he has one class on

Wednesday and two classes on Tuesday, and on Tuesday he gets an hour break in between his two classes (Tr. 34-35). He said that he is very tired when he comes home from school on those days (Tr. 37).

Plaintiff stated that he took the bus to school and he experienced difficulty with riding the bus, particularly with standing up and sitting down (Tr. 29). He testified that his back hurt when sitting for a long period of time, but his medication helped at times (Tr. 29). He stated that he walks with a cane that his doctor prescribed for him in 2009 (Tr. 29-30). He reported that he took Norco and Mobic for his back pain, and that he had side effects of drowsiness (Tr. 30-31). In further explaining his back pain, he stated that the pain was located in his lower back, the pain traveled down into his legs, and he experienced pain on a daily basis at a level of six with medication and eight without (Tr. 32-33). He reported that he had undergone trigger point injections and two rhizotomy procedures, but reported that he did not see any improvements in his pain level (Tr. 32-33). Aside from taking medication, he alleviated his back pain by lying down (Tr. 33). On the days that he was not in school, he said that he laid down for three to four hours to alleviate back pain (Tr. 37). He stated that he had other problems with his back and neck; specifically, when he turned to the left the motion gave him a "kink" in his neck (Tr. 35-36). He also indicated that he had breathing problems due to rib fractures from an accident he was involved in (Tr. 36).

Plaintiff stated that at the time of the hearing he was six feet tall and about 316 pounds (Tr. 36). He estimated that in the year preceding the hearing, he gained 75 to 80

pounds due to inactivity (Tr. 37).  He denied other health problems aside from neck, back, and rib pain (Tr. 37).  He reported that financial constraints obliged him to live with his brother, adding that he received food stamps (Tr. 38).

Plaintiff testified that he was a former boxer, and when he was healthier in 2008-2009 he was able to mentor young men by teaching boxing (Tr. 38).  He stated that at the time of the hearing he was unable to teach boxing any longer (Tr. 38).  He said that he could sit for about an hour to an hour and a half before his back started hurting and he had to stand up or lie down (Tr. 38).  He reported that he could stand for about an hour to an hour and a half before having to sit down (Tr. 38).  He said that he used a cane at all times, even in his own home and could only walk about a block to a block and a half at a time; after that, his back gets tired (Tr. 39).  He said that the bus stop was a block and a half from his house (Tr. 39).  He testified that he could lift about 10 pounds (Tr. 39). He reported that he has also had physical therapy on his back or neck (Tr. 40).

Plaintiff testified that for the two months prior to the hearing he attended a weekly aerobics-type dance class at his doctor's advice (Tr. 40 -41). Although the ALJ noted medical records showing dance class attendance the previous summer, Plaintiff stated, "I don't remember" taking the earlier classes (Tr. 41).

### B.    Medical Evidence

#### 1.    Treating Sources

In August 2009, Plaintiff sought emergency treatment after falling down a flight of stairs (Tr. 208, 248).  He attributed the fall to knee weakness resulting from a recent

-4-

motor vehicle accident about a month earlier (Tr. 248). He was diagnosed with multiple rib fractures from ribs 1-7 on his right side (Tr. 211, 222). He was admitted to the hospital and given an epidural for pain control after complaining of spasms and sharp pain on the right side of his chest, the location of the fractures (Tr. 213). His pain level before the epidural was listed as a 9-10 (Tr. 213). Doctors ordered several imaging studies of his chest during his stay at the hospital, including a CT scan (Tr. 275-287). The CT scan performed on the chest, abdomen and pelvis area confirmed the rib fractures but found no other internal injuries other than arterial plaquing (Tr. 281). The CT scan performed on the thoracic and lumbar spine area confirmed the rib fractures and found that there was scarring and a partially collapsed lung (Tr. 282). This scan also found that the thoracic and lumbar spine was in anatomic alignment and vertebral heights and disc spaces were maintained (Tr. 282). Another imaging scan found a right basilar subsegmental atelectasis[1] (Tr. 276). He was discharged on August 30, 2009 in stable condition (Tr. 225). According to his discharge instructions, the rib fractures were likely to heal in 6 to 8 weeks (Tr. 223). He was given instructions to return to the emergency room if he experienced trouble breathing, nausea, vomiting, stomach pain, or fever (Tr. 223, 230-31).

On September 4, 2009, Plaintiff sought emergency treatment for abdominal pain and nausea (Tr. 201-05). The physician's notes indicated that the pain was precipitated

---

[1] A partially collapsed lung. *See* http://medical-dictionary.thefreedictionary.com/subsegmental+atelectasis.

-5-

by a change in medication (Tr. 201).  An ultrasound of the upper right quadrant of the

abdomen was unremarkable (Tr. 272).  Other imaging studies of the abdomen showed a

small effusion,[2] low lung volume, and mild tortuosity to the thoracic aorta.[3] (Tr. 272-74).

He was diagnosed with Gastroesophageal Reflux Disease (GERD) and he was discharged

with medications that same day (Tr. 206).

Plaintiff first visited the office of the Wayne State University Physician Group

("University Physician Group") on May 26, 2010 complaining of back pain and

hypertension (Tr. 332).  He was given a referral to the University Pain Clinic ("Pain

Clinic") as well as a prescription for Neurontin[4] for "presumed neuropathic pain" (Tr.

337).  The report noted that a previous MRI of Plaintiff's lumbar spine area showed

foraminal stenosis[5] at L5-S1, but most of his trauma was to the thorax area after his fall

down the stairs (Tr. 337).  Dr. Kristen Kingzett, M.D. noted that Plaintiff's physical

problems could be attributable to long-term effects from his extensive boxing career,

referring to his knee pain, hand osteoarthritis, and possible effects of repeated head

---

[2] A small escape of fluid or collection of fluid. *See* http://medical-dictionary.thefreedictionary.com/effusion.

[3] The upper part of the descending aorta was bent or twisted somehow. *See* http://medical-dictionary.thefreedictionary.com/tortuosity; *see also* http://medical-dictionary.thefreedictionary.com/thoracic+aorta.

[4] Neurontin is commonly prescribed for nerve pain. *See* http://www.drugs.com/neurontin.html.

[5] Foraminal Stenosis means a narrowing of the spinal foramen, the hole through which passes a spinal nerve as it exits the spine. *See* http://www.nervous-system-diseases.com/foraminal-stenosis.html.

trauma (Tr. 337).  She noted that it was "[d]ifficult to tell how much of his affect is driven by secondary gain (he brought extensive paperwork from his lawyers) vs. uncontrolled pain vs. personality disorder present even prior to accident." (Tr. 337).

Plaintiff had a June 2010 follow-up visit with the University Physician Group for his back pain and hypertension (Tr. 330).  Plaintiff reported that insurance problems prevented him from obtaining Pain Clinic treatment (Tr. 330).  Plaintiff reported that the back pain persisted but denied any new symptoms (Tr. 330). The report also states that he had high cholesterol and started dancing twice per week for exercise two weeks prior to the appointment (Tr. 330).  The report states that members of the staff were going to help him with his insurance and obtaining an appointment with the Pain Clinic (Tr. 331).

The following month, Plaintiff again complained of back pain and headaches (Tr. 326). Specifically, he complained to staff that his legs felt weak after dancing more than four numbers (Tr. 326).  He also complained of headaches in the morning (Tr. 326).  The report of the visit stated that Plaintiff had still not been to the Pain Clinic yet because of insurance issues (Tr. 326).  The report also stated that the Plaintiff was reassured that his "T-spine MRI is normal," and that staff arranged for him to receive assistance in communicating with his insurance company to get approval for visits at the Pain Clinic (Tr. 328).  His Neurontin dosage was increased (Tr. 327).

On October 7, 2010 Plaintiff received outpatient MRI exams of his cervical and lumbar spine areas at Harper Hospital (Tr. 313-315).  The cervical MRI showed disc degenerative changes in the spine (Tr. 313).  The lumbar MRI indicated disc degenerative

-7-

2:12-cv-14119-GCS-RSW   Doc # 14   Filed 06/10/13   Pg 8 of 26   Pg ID 451

disease as well as desiccation[6] and narrowing of the intervertebral discs (Tr. 315).

On February 7, 2011, Plaintiff again visited the University Physician Group (Tr. 356). Dr. Kingzett wrote in her report that Plaintiff asked her if, in her opinion, he should have the Pain Clinic do a procedure on his back (Tr. 356). The report also states that although his pain was relieved at the time of an injection in his back, his response to the injection was not sustained (Tr. 356). During this visit, Dr. Kingzett recommended that Plaintiff undergo the Rhizotomy procedure but cautioned him that it might not be successful (Tr. 358). Dr. Kingzett also declined to refill his pain medications because he was overusing Tylenol and she suspected that his headaches were withdrawal headaches from the narcotics (Tr. 357-58). She also recommended that he obtain health insurance as soon as possible because he could not afford many of the recommended procedures (Tr. 358). According to the report, Plaintiff told Dr. Kingzett that he exercises by dancing one time per week for several hours and changed his diet to improve his high cholesterol (Tr. 356).

On February 10, 2011, Dr. Kingzett completed a medical assessment of ability to do work-related physical activities (Tr. 318). According to the assessment, Plaintiff's diagnosis was back pain with symptoms of pain in lower back radiating to legs and feet, the pain being worse with increased activity (Tr. 318). The clinical findings were mild spinal degeneration and mild spinal stenosis (Tr. 318). Possible side effects of Plaintiff's

---

[6] Drying. *See* http://www.medilexicon.com/medicaldictionary.php?t=24061.

-8-

medications that affect functioning were listed as drowsiness, dizziness, and nausea from pain medication (Tr. 318). Dr. Kingzett found that Plaintiff could lift and carry 10 pounds frequently and no more than 20 pounds rarely (Tr. 318). She also found that Plaintiff could walk for a total of 2 hours in an 8 hour day, including 30 minutes of uninterrupted walking (Tr. 319). The assessment also states that Plaintiff's impairments are likely to produce about 2-3 days of absence from work per month as a result of the impairment (Tr. 319).

On February 11, 2011 Plaintiff visited the University Pain Clinic for a consultation for back and leg pain (Tr. 343). The clinic adjusted his prescriptions. (Tr. 346) On February 14, 2011 Plaintiff visited the University Pain Clinic and received a trigger point injection for pain relief (Tr. 343). The report indicated that before the procedure, the Plaintiff's pain level was a six out of ten and after the procedure the Plaintiff's pain level was a two out of ten, representing a 70% improvement in pain (Tr. 343). The clinic also recommended that he schedule a lumbar unilateral rhizotomy[7] (Tr. 346).

On February 18, 2011, Plaintiff visited the University Pain Clinic for the rhizotomy procedure on the right side of his lower back (Tr. 363). The report states that he tolerated the procedure well, there were no complications, and the response to the previous procedure was that he was better by 80% (Tr. 363). On March 11, 2011, Plaintiff visited the University Pain Clinic for the rhizotomy procedure on the left side of

---

[7] A lumbar unilateral rhizotomy involves cutting spinal nerve roots for pain relief. *See* http://www.medilexicon.com/medicaldictionary.php?t=78312.

his lower back (Tr. 360).  The report states that he tolerated the procedure well, there were no complications and the response to the previous procedure was that he was better by 20% (Tr. 360).  The reports of both procedures state that he would likely have increased pain for approximately two weeks, but after four weeks Plaintiff should see a decrease in pain (Tr. 360, 363).

On March 11, 2011, Dr. Kingzett completed a medical questionnaire and a second medical assessment of ability to do work-related physical activities on behalf of Plaintiff (Tr. 348-349, 351).  Dr. Kingzett stated that Plaintiff was having muscle spasms after having procedures done at the Pain Clinic (Tr. 348).  Dr. Kingzett also stated that he must use a cane to walk and that he could only sit for about 1 hour, stand for 10 minutes, and can walk ½ to 1 block (Tr. 348-49).  She additionally stated that he was unable to work in his chosen profession as a truck driver (Tr. 348-49).  Dr. Kingzett stated that Plaintiff had severe back pain which increased with activity and required a cane to ambulate (Tr. 351).  Dr. Kingzett also stated that Plaintiff could lift 10 pounds occasionally due to increased back pain and muscle spasms, he could sit for 2-3 hours in a regular 8 hour day, and he could sit uninterrupted for one hour (Tr. 351-52).  She also stated that Plaintiff would require unscheduled breaks during the day every hour for 15-20 minutes at a time and would likely miss work four days per month due to "bad days." (Tr. 352).

### 2.    Non-Treating Sources

On March 2, 2010, Jose Mari G. Jurado, M.D. of the Sierra Medical Group conducted an evaluative examination of Plaintiff on behalf of the SSA (Tr. 288-90).  Dr.

-10-

Jurado noted in his report that Plaintiff could stand for 45 minutes, sit for one hour and 45 minutes, and walk half a block (Tr. 288). He also noted that Plaintiff had problems with balance and falling, has headaches, dizziness, head injury, and blurred vision (Tr. 288). Plaintiff alleged shakiness, tremors, dropping things, memory problems, twitching, and weakness (Tr. 289).

Dr. Jurado found no tenderness or muscle spasm and a normal range of cervical motion (Tr. 289). The report noted that straight leg raising was 10 degrees on the right and 50 degrees on the left (Tr. 290). The range of motion was done but with pain on flexion 0-45 degrees (Tr. 290). In the lower extremities, Dr. Jurado noted that range of motion of the hips was limited by pain on both sides, the range of motion of the knees, ankles, and feet was within normal limits, and squatting was done to 10 degrees (Tr. 290). Dr. Jurado also reported that Plaintiff was able to bear weight without pain (Tr. 290). Dr. Jurado concluded that Plaintiff was able to ambulate without a cane, able to heel walk and toe walk with some difficulty, but was unable to tandem walk (Tr. 290). Dr. Jurado also concluded that Plaintiff was able to sit and stand without assistance, and also able to bend, stoop, carry, push and pull (Tr. 290). That same day, Dr. Herb Weisenthal, D.O. found degenerative changes in the medial compartment of Plaintiff's right knee (Tr. 291). The neurologic and orthopedic supplemental report indicates that clinical evidence supports the need for a walking aid to reduce pain (Tr. 295).

On March 16, 2010, Dr. Avigdor Niv, M.D. completed a case analysis on behalf of the Social Security Administration (Tr. 297). Dr. Niv made several conclusions regarding

Plaintiff's conditions (Tr. 297). He concluded that the rib fractures were a non-severe impairment because they were expected to heal in less than 12 months (Tr. 297). He concluded that the alleged lower back pain and neck pain also did not represent a severe impairment (Tr. 297). He concluded that his degenerative joint disease of the right knee with antalgic gait requiring use of a cane was a severe impairment, but not of listing level (Tr. 297). He noted that Plaintiff's obesity further impacted his impairment (Tr. 297). He also noted, "There is a gap of credibility between the claimant's alleged impairments, using a walker for the [SSI physical] exam, a cane otherwise." (Tr. 297).

According to Dr. Niv's Physical Residual Functional Capacity Assessment (RFC Assessment), Plaintiff was able to lift 20 pounds occasionally and 10 pounds frequently (Tr. 299). He was able to stand and/or walk for a total of 6 hours per day but required a cane for ambulation (Tr. 299). He was able to sit for about 6 hours per day (Tr. 299). Pushing and pulling were limited in lower extremities because he needed a cane for balance and pain relief, and his right leg was suitable for working with foot controls, occasionally only (Tr. 299). Dr. Niv also concluded that Plaintiff had the postural limitations of never being able to climb ladders, ropes or scaffolds; however could occasionally climb a ramp or stairs, balance, stoop, kneel, crouch, or crawl (Tr. 300). Dr. Niv concluded that Plaintiff had no manipulative, visual, or communicative limitations (Tr. 300-301). He also concluded that Plaintiff had the environmental limitation of avoiding exposure to hazards such as machinery due to his cane usage (Tr. 302).

On March 17, 2010, Dr. Juan C. Troncoso, M.D. completed a neurology review of

-12-

Plaintiff on behalf of the SSA (Tr. 306). Dr. Troncoso concluded that there was no

documented impairment of the neurological system (Tr. 306). On April 14, 2010,

Plaintiff had an opthalmic consultative examination because he alleged blurred vision; Dr.

Stephen Hameroff, M.D. concluded that Plaintiff's eye impairment was nonsevere (Tr.

310).

### C.    Vocational Expert Testimony

The ALJ posed the following hypothetical question to the VE:

> [A]ssume you have a hypothetical man who's a person closely approaching
> advanced age with appearance of degenerative joint disease of the right knee
> with status post multiple rib fractures, obesity, degenerative changes to the
> spine, and well, if we were to assume that these impairments were to limit that
> hypothetical man to work at the light exertional level; occasionally lifting up
> to 20 pounds/frequently lifting 10 pounds or less; with occasional climbing of
> stairs and ramps and no climbing of ladders, ropes, or scaffolds or exposure to
> heights or dangerous moving machinery due to obesity; occasional balancing,
> stooping, kneeling, crouching, or crawling.
> Well, if those are the limitations, would there – would that hypothetical man
> be able to do any of Mr. Jones' past work?

(Tr. 42).

VE Glee Ann Kehr classified Plaintiff's former work as a truck driver as

exertionally medium to medium-heavy[8] as performed (Tr. 42). The VE testified that a

---

[8] 20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10
pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and
small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting
or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than
50 pounds at a time with frequent lifting or carrying of objects weighing up to 25
pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a
time with frequent lifting or carrying of objects weighing up to 50 pounds.

hypothetical individual with the above limitations would not be able to perform any of

Plaintiff's past work (Tr. 42). The VE then reported that Plaintiff could perform the light,

unskilled jobs of counter clerk (9,900 jobs in the regional economy); office helper

(3,700); and information clerk (18,500). The VE stated that her testimony was consistent

with the information found in the *Dictionary of Occupational Titles* (Tr. 43).

> **D.     The ALJ's Decision**

Citing Plaintiff's medical records, ALJ Gatto found the severe impairments of

"degenerative joint disease, right knee, status post surgery; rib fractures; obesity; [and]

degenerative changes to the cervical and lumbrosacral spine" but found that none of the

conditions met or medically equaled a Listing found in 20 C.F.R. part 404 Appendix 1,

Subpart P (Tr. 55). He determined that Plaintiff retained the Residual Functional

Capacity ("RFC") for light work precluding "climbing ladders, ropes, or scaffolds" and

"work[ing] near hazards such as unprotected heights and moving machinery," but that

Plaintiff could "occasionally climb[] stairs and ramps," and could "occasionally balance,

stoop, kneel crouch, and crawl." (Tr. 57).

The ALJ found that Plaintiff was "unable to perform any past relevant work" as a

truck driver or forklift operator, which the VE characterized as low-end semiskilled work

with medium level exertion (Tr. 60). After noting that transferability of job skills was not

material because Plaintiff was "not disabled," the ALJ determined that there were jobs

that exist in significant numbers in the national economy that Plaintiff could perform (Tr.

60). Adopting the VE's job numbers, the ALJ found that although Plaintiff could no

longer perform past relevant work, he was capable of making a successful adjustment to

working as a counter clerk, office helper, or information clerk (Tr. 61-62).

The ALJ found Plaintiff's allegations of limitation inconsistent and not credible

(Tr. 58).  Further, the ALJ rejected the treating physician's opinions, noting that

Plaintiff's activities of dancing and college attendance undermined the treating

physician's assessment (Tr. 60). Therefore, he was "unable to afford controlling weight to

the treating physician's assessments of the claimant's physical capacity." (Tr. 60).  The

ALJ adopted, in large part, the non-treating physician Dr. Niv's assessment of ability to

do work-related activities, but noted that objective medical evidence did not support the

need for a cane (Tr. 60).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine

whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary*

*of Health and Human Services*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence

is more than a scintilla but less than a preponderance.  It is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v.*

*Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated*

*Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938).  The

standard of review is deferential and "presupposes that there is a 'zone of choice' within

which decision makers can go either way, without interference from the courts." *Mullen*

*v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the

-15-

evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## <u>FRAMEWORK FOR DISABILITY DETERMINATIONS</u>

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; (4) can return to past relevant work; and (5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984).

-16-

## ANALYSIS

Plaintiff makes three arguments in favor of remand.  He first argues that the ALJ erred by making an improper credibility finding contrary to Social Security Ruling ("SSR") 96-7p and 20 C.F.R. § 404.1529. *Plaintiff's Brief* at 7-9.  Next, he contends that the ALJ failed to give proper deference to the opinion of the plaintiff's treating and consultative physician. *Id*. at 9-11.  Finally, Plaintiff argues that the ALJ made an improper Step 5 determination by failing to incorporate many of Plaintiff's physical restrictions into the hypothetical posited to the VE. *Id*. at 11-12.

### A.    Credibility

Plaintiff contends that the ALJ made an improper credibility finding contrary to SSR 96-7p and 20 C.F.R. § 404.1529.  Specifically, Plaintiff contends that the ALJ distorted the record because he referred to Plaintiff's school attendance as full-time when it was really part time. Plaintiff also contends that the ALJ repeatedly mischaracterized Plaintiff's testimony regarding ballroom dancing, because Plaintiff insisted it was aerobic activity for weight loss rather than dancing.  Beyond that, however, Plaintiff does not state exactly how the ALJ's credibility finding ignores SSR 96-7p or 20 C.F.R. § 404.1529.[9]

---

[9] According to 20 C.F.R. § 404.1529, a judge must consider all symptoms, including pain, to the extent that the symptoms and pain are consistent with objective medical evidence and other evidence.  20 C.F.R. § 404.1529.  Factors relevant to symptoms such as pain include daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; treatment other than medication for

SSR 96-7p provides guidance in assessing the credibility of a witness or plaintiff. When determining an individual's credibility, the ALJ must consider the entire record. *Id*. This includes (1) the objective medical evidence; (2) the individual's own statements; (3) statements provided by treating or examining physicians;(4) statements provided by other persons about the symptoms; and (5) any other relevant evidence provided by the record. *Id*. at *1. The ruling also notes that a judge may not disregard an individual's statements about the intensity and persistence of pain or other symptoms solely because they are not substantiated by objective medical evidence. *Id*.

The determination that Plaintiff's allegations are not credible is well-substantiated and well within the discretion of the ALJ.  The ALJ noted that Plaintiff attends a community college, takes public transportation to school, and takes ballroom or aerobic dancing classes once or twice per week for exercise (Tr. 58).  The ALJ noted that these activities are inconsistent with Plaintiff's allegations of severe pain and significant problems with ambulation (Tr. 58).  The ALJ also noted several inconsistencies between Plaintiff's allegations and the reports of the treating and non-treating sources (Tr. 58-59). Specifically, the ALJ noted that Plaintiff's allegations of disability are inconsistent with the conclusions of three doctors that Plaintiff is able to occasionally climb stairs, balance, stoop, kneel crouch, and crawl (Tr. 58-60).  Furthermore, one doctor noted that it was

---

pain relief; non-medication measures necessary for pain relief such as lying down or standing up; and other factors concerning functional limitations and restrictions due to pain or other symptoms.  *Id*.

-18-

difficult to determine how much of Plaintiff was motivated by actual pain versus secondary gain since he brought extensive paperwork from his lawyers to the appointment (Tr. 58). Because the credibility determination is thoroughly explained and well-supported, remand on this issue is not warranted.

Aside from the fact that the credibility determination was procedurally correct, a credibility determination of a witness or claimant is well within the discretion of an ALJ. "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). "[A]n ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.'" *Cruse v. Commissioner of Social Sec.,* 502 F.3d 532, 542 (6th Cir.2007)(citing *Walters v. Commissioner of Social Sec.,* 127 F.3d 525, 531 (6th Cir.1997)). Accordingly, the ALJ's credibility determination should not be disturbed.

### B.      Deference to Treating and Consultive Physician

Plaintiff next claims that the ALJ failed to give proper deference to the opinion of Plaintiff's treating and consultative physician. Specifically, Plaintiff claims that the ALJ improperly rejected the treating physician's opinion that Plaintiff is disabled and that the ALJ set forth improper reasoning for rejecting the treating physician's opinion.

Plaintiff is correct that an uncontradicted, well-supported treating source opinion "must be given controlling weight." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (citing *Wilson v. Commissioner of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (internal

-19-

quotation marks omitted)).  However, the ALJ found and the record confirms that Dr.

Kingzett's opinions not only contradicted each other without substantiated explanation for

the alleged decline in Plaintiff's condition, but also contradicted other, objective evidence

in the record.  The ALJ noted that Dr. Kingzett's last two assessments were completed

less than a month apart (Tr. 59).  In rejecting Dr. Kingzett's assessments, the ALJ noted

there were "significant unexplained inconsistencies in the forms and that the form most

supportive of the claimant' (sic) position was completed only five days before the

scheduled hearing." (Tr. 59).  The ALJ also found that the two opinions were inconsistent

with other evidence in the record; namely, Plaintiff's activities of college attendance and

dancing (Tr. 59-60). Acknowledging Plaintiff's February and March 2011 lumbar

radiofrequency ablation procedures, the ALJ pointed out the inconsistency between the

University Pain Clinic noting an increasing favorable response at each visit and Dr.

Kingzett's opinions indicating a decline in Plaintiff's condition without explaining why

(Tr. 60).

To be sure, Dr. Kingzett's March 11, 2011 report points to "increased pain and

muscle spasms" as the reason for the plaintiff's limitation on lifting (Tr. 351).  But the

report does not expressly explain why the Plaintiff saw an alleged increase in pain despite

University Pain Clinic records to the contrary.  Although it is within the realm of

possibility that Dr. Kingzett's March 11, 2011 questionnaire and assessment represented

an actual increase in pain level, evidence in the record supporting this indicates that any

increase in pain level due to the rhizotomy procedures would have been temporary (Tr.

360, 363).

There is evidence in the record that suggests a possible reason for a temporary increase in pain. During an office visit, Dr. Kingzett recommended that Plaintiff have the Rhizotomy procedures done but noted that there was a chance that he would not respond to the procedure or that his pain would get worse (Tr. 358).  Additionally, the reports from the University Pain clinic following the procedures state that Plaintiff would likely have increased pain for approximately two weeks, but that after four weeks Plaintiff should see a decrease in pain (Tr. 360, 363). At the time of the hearing, which was about four weeks after the procedure, Plaintiff may well have been experiencing some level of pain. However, there is no objective evidence that this was anything more than a temporary increase. In fact, there is only evidence to the contrary, as University Pain Clinic records indicated favorable responses to the trigger point injections and rhizotomy procedures (Tr. 343, 360, 363).

Plaintiff also argues that the ALJ set forth "erroneous[10] reasons" for rejecting the

_____

[10] While the Plaintiff does not argue that the ALJ failed to apply the appropriate factors in rejecting the treating physician's opinion, it is worth pointing out that the ALJ, even if implicitly, did point out the length of the treating relationship, the frequency of examination, the supportability of the treating physician's opinion, and the consistency of the opinion with the record as a whole.  The ALJ did not mention one factor listed, the specialization of the treating source.  However, that is not dispositive because he did examine the other factors and made it clear that he was giving Dr. Kingzett's March 11, 2011 assessment and questionnaire "very little weight" (Tr. 60).  *See Wilson v. Commissioner of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (listing the factors the ALJ must discuss if the opinion of a treating source is not accorded controlling weight); *see also* 20 C.F.R. 1527(d)(2).

treating physician's opinion. *Plaintiff's Brief* at 9.  First, Plaintiff argues that activities of

college attendance and dancing are not inconsistent with Plaintiff's level of pain. *Id*.

Plaintiff points out that sitting in a classroom for three hours per class, for a total of nine

hours per week, does not equate to being able to work a full-time job. *Id*. at 8.  While it

may be true that going to school does not equate to being able to work full time, the ALJ

also points to other evidence in the record to support his rejection of the treating

physician's March 2011 assessment; namely, dancing[11] and other medical assessments in

the record (Tr. 60).  Plaintiff also points out the ALJ's repeated mischaracterization of

Plaintiff's testimony as "ballroom" dancing when instead it is really "aerobic activity at a

gym." *Plaintiff's Brief* at 8.  Plaintiff seems to argue that the ALJ was giving too much

weight to the dancing by pointing it out repeatedly. Plaintiff also asserts that the ALJ's

questioning "could be construed as badgering or mocking." *Id*.  Even if the ALJ

aggressively questioned the Plaintiff (which he was entitled to do), most forms of dancing

– including ballroom and aerobic dancing – require more range of motion, flexibility, and

stamina than Plaintiff alleged in his claim for disability.  While it is laudable that Plaintiff

was taking his doctor's advice and exercising to improve his health (Tr. 41), his ability to

---

[11] The Plaintiff seems to have a hard time explaining the inconsistency present in
his claim of disability due to debilitating pain and his ability to do aerobic or ballroom
dancing.  Plaintiff does not point to any objective evidence that someone with disabling
pain can engage in dancing while still being disabled according to the law. Plaintiff cites
*Cohen v. Sec'y of Health & Human Servs*., 964 F.2d 524, 531 (6th Cir. 1992). But that
case is distinguishable from the case at bar because the claimant in that case was suffering
from chronic fatigue syndrome, not pain, and did not allege difficulty walking, sitting, or
standing.

do either dancing or aerobic activity at a gym is inconsistent with his claim of disability.

Second, Plaintiff argues that the ALJ said that there were inconsistencies in the February and March 2011 assessments but did not point out what they were. *Plaintiff's Brief* at 9-10. Plaintiff further argues that the opinions were essentially the same. *Id.* Defendant disputes this, contending that the limitations increased significantly from February to March 2011. *Defendant's Brief* at 11. According to the February 2011 assessment, Plaintiff could lift and carry 10 pounds frequently and no more than 20 pounds rarely (Tr. 318). Plaintiff was able to walk for a total of 2 hours in an 8 hour day, 30 minutes uninterrupted (Tr. 319). Plaintiff would likely be absent 2-3 days per month as a result of his impairment (Tr. 319). The February report did not mention a cane (Tr. 318-19). According to the March 2011 assessment, Plaintiff could lift 10 pounds occasionally (Tr. 351-52). Plaintiff could walk ½ to 1 block, stand for 10 minutes, and sit for 1 hour uninterrupted and 2-3 hours total in an 8 hour day (Tr. 348-49; 351-52). Plaintiff would likely be absent more than 4 days per month due to "bad days." (Tr. 352). Dr. Kingzett listed "increased back pain and muscle spasms" as medical findings that support the lifting and carrying decrease. (Tr. 351). In the March report, Dr. Kingzett opined that Plaintiff needed a cane to ambulate (Tr. 351-52).

These two assessments can hardly be said to be "very consistent," as the Plaintiff asserts. The two assessments, given a month apart, suggest that Plaintiff experienced a sudden decline in his condition but do not explain why. The March 2011 assessment points to "increased pain and muscle spasms" as the reason for the decrease in Plaintiff's

lifting and carrying ability from 10 pounds frequently to 10 pounds occasionally, but the report does not give a reason for the sudden decrease in Plaintiff's overall condition (Tr. 351-52). Thus, the ALJ properly characterized the decline as "unexplained." (Tr. 60).

The ALJ pointed to specific findings in the record to support his conclusion that Dr. Kingzett's March 2011 opinions should be afforded "very little weight." (Tr. 60). In particular, he pointed to the mostly unexplained discrepancy between her opinion from that date and her opinion from only a month earlier (Tr. 60). He also pointed to the discrepancy between that unexplained decline and opposite evidence from the University Pain Clinic indicating that the Plaintiff had favorable responses to the procedures (Tr. 60). He also noted that the pain clinic found that the Plaintiff had normal range of motion, that his gait was normal and that he was able to stand without difficulty (Tr. 60). Because the ALJ provided substantial evidence to support his refusal to give controlling weight to the treating physician, this decision should be upheld.

### C.    Step Five Determination

The Plaintiff asserts that the ALJ erred in failing to incorporate many of Plaintiff's physical restrictions into the hypothetical question given to the vocational expert. *Plaintiff's Brief* at 11. In particular, Plaintiff argues that Dr. Kingzett's reported limitations such as the ability to lift only 10 pounds and missing 2-4 days per month were missing from the hypothetical question. *Id.*

A hypothetical question constitutes substantial evidence only if it accurately portrays the individual's physical and mental impairments. *Varley v. Commissioner of*

-24-

*Health and Human Services*, 820 F.2d 777, 779 (6th Cir. 1987).  The Sixth Circuit has rejected the proposition that all of the claimant's maladies must be listed verbatim, but "[t]he hypothetical question . . . should include an accurate portrayal of [a claimant's] individual physical and mental impairments." *Webb v. Commissioner of Social Sec.*, 368 F.3d 629, 632 (6th Cir. 2004).

The ALJ concluded in the treating physician analysis that the physician's physical capacity assessments were unreliable.  Thus, he was not required to include the rejected findings that Plaintiff can only lift ten pounds and would miss 2-4 days per month in the RFC or the hypothetical question posited to the VE for his Step Five analysis. *Stanley v. Secretary of Health and Human Services*, 39 F.3d 115, 118-19 (6th Cir.1994) (ALJ not obliged to include discredited findings in the hypothetical question).  Because substantial evidence supports the ALJ's RFC assessment, and the hypothetical question included the same limitations as the RFC assessment, the hypothetical question was proper.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

Objections to this Report and Recommendation must be filed within 14 days of service as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Issues first raised in objections to a magistrate judge's report and recommendation are deemed waived. *U.S. v. Waters,* 158 F.3d 933, 936 (6th Cir. 1998). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S.

140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Under E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

The opposing party may file a response to a party's timely filed objections within 14 days of service. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: June 10, 2013                    s/ R. Steven Whalen
                                        R. STEVEN WHALEN
                                        UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record on June 10, 2013, electronically and/or by U.S. mail.

                                        s/Michael Williams
                                        Relief Case Manager for the Honorable
                                        R. Steven whalen